IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MUHAMMAD ARSHAD KHAN | : | CIVIL ACTION |
| | : | |
| v. | : | NO.   25-2283 |
| | : | |
| KHUSHBO SEEMAB | : | |

# MEMORANDUM

**MURPHY, J.**                                                                                                       September 4, 2025

      This case is part of a globe-spanning family dispute.  After years of living together in Qatar, two parents separated when the mother traveled to Pakistan with their two young children.  Soon after, she came to the United States with the children.  The father now petitions under the International Child Abduction Remedies Act for the return of the children to Pakistan, claiming that their home was Pakistan and that they were wrongly removed.  We face a threshold jurisdictional question because unlike Pakistan, Qatar is not a party to the Hague Convention.  So if the children were habitual residents of Qatar immediately before they came to the United States, then we must dismiss.  After holding an evidentiary hearing and considering the parties' briefs, we find that the children were habitual residents of Qatar, not Pakistan.  Thus, for the reasons explained below, we agree with the mother that we do not have jurisdiction and dismiss the father's petition.

**I.**     **Background**

      This case arises under the International Child Abduction Remedies Act (ICARA), 22 U.S.C. §§ 9001–9011.  ICARA is the implementing legislation for the Hague Convention on the Civil Aspects of International Child Abduction (Convention), a multilateral treaty ratified by the

United States in 1988.[1]  Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89.  The Convention seeks to protect children from the harms of international abduction or retention arising out of custody disputes by providing procedures to secure their prompt return to their state of habitual residence and safeguarding rights of access.  *See Monasky v. Taglieri*, 589 U.S. 68, 71-72 (2020); *Abbott v. Abbott*, 560 U.S. 1, 8-9 (2010).  ICARA confers concurrent jurisdiction on state and federal courts over actions arising under the Convention, sets out the burdens of proof, and provides the framework by which a parent may petition for the return of a child or for arrangements securing the effective exercise of visitation rights.  *See* 22 U.S.C. § 9003(a); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270-71 (3d Cir. 2007).  The remedies available under ICARA are limited: we may order the return of a child to his or her country of habitual residence but we may not adjudicate the merits of any underlying custody dispute.  *See Tsai-Yi Yang*, 499 F.3d at 270 ("It is well settled that the Convention was not designed to resolve international custody disputes.").

Petitioner Muhammad Arshad Khan petitions for the return of his two minor children, H.A.K. (age nine) and H.K. (age six) pursuant to ICARA.  *See* DI 1.  The parties filed pretrial briefs; we held an evidentiary hearing; and the parties then submitted post-trial briefs.  *See* DI 19; DI 20; DI 24; DI 31; DI 32.

Mr. Khan and Ms. Seemab were married in 2013 in Islamabad, Pakistan and lived together with their children in Qatar for much of the children's upbringing.  DI 24 at 10:25-

---

[1] As of today, there are one hundred three signatory countries; Qatar is not a signatory. *See* Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

11:13, 82:22-23.  Both children were born in the United States but returned to Qatar soon after birth.  *Id.* at 44:15-45:3, 83:6-17.  Mr. Khan was employed in Qatar from 2010 to 2023, and the family lived in Qatar continuously following the parties' marriage but visited family in Pakistan from time to time.  *Id.* at 10:25-11:13, 45:24-46:6, 83:18-87:19.  The children attended school in Qatar.  *Id.* at 45:4-9, 91:8-11.

In fall 2024, Ms. Seemab traveled with the children to Pakistan.  The trip was consistent with the annual break in the Qatari school calendar, during which the family typically visited relatives in Pakistan before returning to Qatar.  DI 32 at 2-3; DI 24 at 94:11-95:21.  Mr. Khan argues that the family had shifted their residence to Pakistan at that time.  He emphasizes the length of the visits to Pakistan, and Ms. Seemab and the children's relocation to Pakistan in 2024.  DI 24 at 17:1-18:20; DI 31 at 3-4.  Ms. Seemab disagrees and argues that the family's residence remained in Qatar, explaining that the 2024 trip to Pakistan was an ordinary vacation aligned with the Qatari school year.  DI 32 at 2-3; DI 24 at 89:25-90:9, 94:11-95:21, 103:3-8.

Ms. Seemab stated that after traveling from Islamabad to Swat, Pakistan to stay with her parents, Taliban operatives visited her parents' residence and threatened to seize the children.  DI 24 at 98:13-101:20, 103:25-109:7.  She testified that, fearing for their safety, she left Pakistan with the children and traveled to the United States in late 2024.  *Id.* at 110:19-24.  Mr. Khan disputes this account and maintains that Ms. Seemab wrongfully removed the children from Pakistan to the United States without his consent.  *Id.* at 30:9-34:2; DI 31 at 4-6.

II.     **Legal standard**

ICARA grants us jurisdiction over actions "arising under the Convention" and prescribes procedures to implement the Hague Convention.  *See* 22 U.S.C. §§ 9003(a)-(h), 9001(b)(1).

3

"[T]he Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Monasky*, 589 U.S. at 72 (citing Convention, art. 12). Under the Convention, a removal or retention is "wrongful" if it breaches rights of custody "under the law of the State in which the child was habitually resident immediately before the removal or retention" and those rights were being exercised or would have been exercised but for the removal. Convention, art. 3; *see* 22 U.S.C. § 9003(f)(2). It is the petitioner's burden to establish "that the child has been wrongfully removed or retained within the meaning of the Convention" by a preponderance of the evidence, and the respondent who opposes has the burden of establishing that certain exceptions apply. *See* 22 U.S.C. § 9003(e).

Habitual residence is a fact-intensive inquiry that considers "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has 'a degree of settled purpose' from the child's perspective." *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)). We must look to the child's perspective, informed by the parents' shared intent, in making this determination. *Tsai-Yi Yang*, 499 F.3d at 271-72.

In this case, our determination of the habitual residence of the children determines whether we have jurisdiction to hear this dispute. *See Taveras v. Taveras*, 397 F. Supp. 2d 908, 912 (S.D. Ohio 2005), *aff'd sub nom. Taveras v. Taveraz*, 477 F.3d 767 (6th Cir. 2007) ("When 'a child is taken from a non-signatory country and is retained in a signatory country,' it is well-settled law that 'there is no remedy' because the terms of the Convention 'are only applicable to those countries who signed the Convention and thereby agreed to abide by its terms.'" (quoting

4

*Mezo v. Elmergawi*, 855 F. Supp. 59, 62 (E.D.N.Y. 1994))); *Ogawa v. Ogawa*, 221 P.3d 699, 705-06 (Nev. 2009); *Alikovna v. Viktorovich*, No. 19-23408, 2019 WL 4038521, at *2 (S.D. Fla. Aug. 27, 2019). The Convention applies "to any child [under the age of sixteen] who was habitually resident in a Contracting State immediately before any breach of custody or access rights." Convention, art. 4. Where a child's habitual residence is in a non-signatory country, we may dismiss the ICARA petition for lack of jurisdiction. *See In re Mohsen*, 715 F. Supp. 1063, 1065 (D. Wyo. 1989) (dismissing because child was a habitual resident of Bahrain, a non-signatory).

Thus, the ordinary starting point for evaluating the merits of an ICARA petition — the children's habitual residence — directly controls our subject matter jurisdiction because one of the proffered residences is a non-signatory, Qatar. If the petitioner fails to establish that the children's habitual residence is in a contracting state, the Convention provides no remedy, and we must dismiss.

**III.    Analysis**

The question here is where the children habitually resided immediately before their removal to the United States. *See* Convention, art. 3; 22 U.S.C. § 9003(e)(1)(A). Mr. Khan contends that the children's habitual residence was Pakistan at the time of removal because the family agreed that Ms. Seemab and the children would live there for at least a year while he sought new employment. *See* DI 31 at 3. He therefore seeks their return to Pakistan. Ms. Seemab maintains that the children's habitual residence was Qatar, where they had spent their lives until late 2024, and she argues that because Qatar is not a contracting state to the Hague Convention, we lack subject matter jurisdiction. *See* DI 32 at 2-3. We agree with Ms. Seemab

5

that the habitual residence of the children is Qatar because the evidence does not establish a shared parental intent regarding the purpose of the move to Pakistan and the children had not sufficiently acclimated to life in Pakistan prior to their removal to the United States.

The children were born in the United States but were quickly returned to Qatar and lived there continuously for nearly their entire lives until 2024. DI 24 at 44:1-45:11, 104:9-11. They attended school and had friends in Qatar and both parties considered Qatar the family home up until the fall 2024 move. Id. at 28:10-16, 104:9-11. Both parties acknowledge that the family frequently traveled to Pakistan to visit relatives, but these trips often coincided with school holidays and were temporary. *Id.* at 94:11-95:21. This evidence demonstrates that the children and the family were rooted in Qatar.

The dispute centers on whether the children's habitual residence shifted to Pakistan because of the 2024 trip. Mr. Khan testified that the family agreed that the children and Ms. Seemab would reside in Pakistan for a year and presented evidence that the children were enrolled in school in Islamabad. *Id.* at 11:5-13:19. Ms. Seemab testified that she understood the trip as a routine vacation, that she was compelled to enroll the children in school briefly by Mr. Khan's family in Islamabad, and that they attended for only three days. *Id.* at 100:14-101:20. She further testified that many of the family's possessions, including the children's, remained in Qatar and that she expected to return there. *Id.* at 95:1-98:12.

Based on the record, we find that the evidence does not support the claim that the children's habitual residence shifted to Pakistan during the fall 2024 stay. First, Ms. Seemab's account of the events was more credible. Second, there was not a shared parental intent to abandon Qatar as the children's home, given the conflicting testimony from the parties about the

6

purpose of the most recent trip to Pakistan. *See Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) ("[T]he mere fact that conflict has developed between the parents does not ipso facto disestablish a child's habitual residence, once it has come into existence."). Third, even taking Mr. Khan's version of events as true and assuming that the children were briefly enrolled in school, the record does not support a finding that the children had acclimated or settled into a life in Pakistan. *See Baxter*, 423 F.3d at 368-69 (finding that a trip that the parties saw "as an opportunity to escape from [] disagreeable circumstances . . . , to visit family, and to buy time to plan their next move . . . falls short of the 'settled purpose' required under the Convention for a finding that the country of habitual residence has been abandoned.").

Short stays abroad, even with brief school enrollment, are typically insufficient to establish acclimatization without deeper integration into the environment. *See Tsai-Yi Yang*, 499 F.3d at 272 (finding that temporary stay and school attendance did not change habitual residence, especially when the child's habitual residence had not been abandoned). Habitual residence depends on "the unique circumstances of the case and [is] informed by common sense," but "[f]or older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Monasky*, 589 U.S. at 78; *see also Blackledge v. Blackledge*, 866 F.3d 169, 180 (3d Cir. 2017) (finding that children as young as four years old can acclimate because they are "able to develop a certain routine and acquire a sense of environmental normalcy" and "able to form meaningful connections with the people and places [they] encounter[] each day" (quoting *Whiting v. Krassner*, 391 F.3d 540, 550-51 (3d Cir. 2004)).

Here, the children's presence in Pakistan in fall 2024 was too brief to establish such

7

acclimatization, particularly when considering their years of life, schooling, and social integration in Qatar.  Both children had lived in Qatar since infancy, were continuously enrolled in school there, and advanced through multiple grade levels.  DI 24 at 44:15-45:11, 91:5-92:11.  Their daily routines, friendships, and extracurricular activities were rooted in that environment.  *Id.* at 26:10-28:16; 70:18-71:25.  The children had routinely visited Pakistan around the same time of year that coincides with Qatari school holidays, typically lasting two months, after which the family returned to Qatar for the academic year.  *Id.* at 83:18-90:9.  During the 2024 stay, one child attended school in Islamabad for only three days before living briefly with family in Swat, without attending school, and eventually traveling to the United States.  *Id.* at 101:15-20.  We also credit testimony that the move was temporary, and that the family planned to return to Qatar, assuming Mr. Khan regained employment there.  *Id.* at 11:24-12:1, 74:9-75:3.  The elder child also testified that he did not know why the family had gone to Pakistan in 2024.  *Id.* at 166:3-4.  His uncertainty underscores the absence of any meaningful acclimation or settled intent to relocate there.  *See Feder*, 63 F.3d at 224 (finding that the focus of the habitual residence analysis is on the child).

Because the children's habitual residence immediately before their removal was Qatar, the Convention provides no remedy, and this matter does not arise under the Convention within the meaning of ICARA.  Thus, we must dismiss.

## IV.   Conclusion

The Hague Convention and ICARA apply only when a child is removed from or retained outside of his or her state of habitual residence, and that state is a contracting party to the Convention.  Based on the record, we find that the children's habitual residence was Qatar, a

non-signatory to the Hague Convention. Because the Convention does not apply, this court lacks subject matter jurisdiction under ICARA.

Accordingly, the petition for return of the children is dismissed for lack of subject matter jurisdiction. An appropriate order follows this memorandum.